Arguments not to exceed 30 minutes per side. Ms. Henry for appellate. May it please the court. Good afternoon. My name is Kelly Henry and it is my privilege along with my colleagues Jay Martin and David Fletcher to represent John Hall in the arguments before the court this afternoon. I'd like to reserve five minutes for rebuttal. Your honors, in the short time that we have together this afternoon, I'd like to focus my argument on the claim referencing the suppression of the psychological evidence regarding the witness informant in the case, Chris Dutton. As I believe a ruling in Mr. Hall's favor will resolve all of the other issues in the case. And that issue I believe is plainly meritorious. In order to evaluate that claim, I think it is important for us to look back at the chronology of the case first in terms of the specific acts that were made and specific representations that were made on behalf of the prosecution with respect to disclosure. And then I think it's important for us to look at what was presented at trial. So if we look first, there was the decision in Kyle's versus Whitley on April the 18th of 1995. One month later, on May the 23rd of 1995, there was a specific motion filed for exculpatory evidence. Thereafter, in June of 1995, the prosecuting attorney sent letters to defense counsel stating, in reference to your request for discovery, we have an open file policy. I encourage you to take advantage of it. Later that year, in November of 1995, the prosecution affirmatively represented on the record to the court that all evidence had been turned over and that they had fully complied with their discovery obligations. After that time, there was a change of counsel. The new counsel filed a motion requesting to adopt all previous motions filed, and that was granted. Thus, there was an affirmative request for discovery evidence, including evidence of mental health, evidence that would impeach the witnesses called on behalf of the state. So this is not a situation here where we are suggesting that the government should have just divined an obligation. There was, in fact, a specific request, even though we know from Kyle's and Banks and Cone that those specific requests really aren't required. If we look now to the evidence at the trial, I'd like to talk about the evidence at the trial when you remove Chris Dutton, because the state had a total of six witnesses. The first witness they called was the witness who responded to the scene and found the body of Ms. Hall. The second witness, a gentleman by the name of Bird, who was a TBI agent, is the individual who processed the crime scene and arrested Mr. Hall. His testimony was that upon arrest of Mr. Hall, he was incredibly remorseful, and he was not impeached on that point. Remorse was important because the defense was that there was no mens rea to first-degree murder. Then the other three witnesses were the juvenile witnesses, the children. It had been three years since they had witnessed what they had witnessed, during which time they had been living with the mother and father of the victim. They were children. Their memories were subject to being manipulated, or just over time we know children's memories change. The children do not provide evidence of premeditation. They provide evidence of a fight which under Tennessee law would have supported a conviction of second-degree, not first-degree murder. It is Chris Dutton that provided the evidence of premeditation. The state's informant. He and he alone testified at trial that Mr. Hall's purpose was to make the victim suffer. That's important not only for the first phase of the case, but it's important for the second phase of the case. How do you relate that to other evidence of premeditation, such as your client cutting off the phone line before he goes into the house, and also the children observing certain behavior of his and statements he might have made during the altercation that might have suggested premeditation? Thank you for that question, Your Honor, because I forgot to talk about the telephone cord, and that's very important. Chris Dutton, at trial, is the only person who talks about Mr. Hall allegedly confessing to removing the telephone cord at the pole for the purpose of Ms. Hall not being able to call the police. The children tried to call the police, but the phone wasn't working. They said the phone wasn't working, but the question, Your Honor, is whether or not the phone was pulled out by Mr. Hall, and if it was pulled out for the purpose of her not being able to call the police. It was discovered afterwards that it had been cut, wasn't it? No, sir. No, sir. The testimony of Mr. Byrd in the record is that the phone was simply out at the pole. I remember having phones that were out at the pole. Okay, so what are you saying, that Sutton was critical to show that Hall is the one that pulled the phone out? Yes, sir. To me it seems cumulative. It really isn't, Your Honor, because Dutton provides the malicious intent of removing the phone. That's the premeditation. Premeditation is circumstantial from pulling out the phone, and he's the only one that a reasonable inference would come to of who did this before. Dutton relayed the statements of Hall, so that's direct evidence of premeditation, but it seems like there's a lot of circumstantial evidence that's still there, that's all. Without Dutton, they don't have proof that Mr. Hall is the one who removed the phone. Isn't it reasonable to assume he did? If we were looking at this under a Jackson v. Virginia standard, I would agree with you, Your Honor, but in Cowles v. Whitley, the court was very clear that we don't use a sufficiency of the evidence standard in these cases, and that's part of the problem. That's part of what happened in the district court, is that he was using the wrong evaluation. We have to look at it in terms of what Brady and Cowles tell us, which is, do we have reason to undermine confidence in the verdict? Animals remove phone cords from the poles all the time. Telephone workers have removed phone cords all the time. I have had the experience of having a phone that was plugged into the pole, and I had to call the phone company, and it had been a squirrel that had removed it. Anybody could have removed it. If we want to undermine confidence in the outcome of the trial, we have to rely on Dutton. You say Dutton is critical, and the Brady violation is that his mental health records were not disclosed by the prosecutor. That's the argument, right? That is the portion of the Brady claim upon which this court granted a certificate of billability. Mental health records of Dutton in the prosecutor's file? We don't have any proof of that in the records, Your Honor. Okay, so when he said you can look at everything in my file, it wasn't there, so there's no Brady violation there. Your Brady violation is you say that he's responsible for the records that the warden had, the prosecutor is responsible for records he did not have in his possession. Is that the argument? Judge Griffin, can I take the first premise and then answer the second question? Because your premise was that an open file policy satisfies Brady, and it actually doesn't. Strickler v. Green and Banks v. Dredd. Well, that kind of implied to me that he violated his open file policy by not giving him what was in the file. My understanding is they provided access to everything in his file, but this just wasn't in his file. The reason for pointing that out to you, Your Honor, is to point out the fact that the defense attorney had every reason to believe that the prosecutor had discharged his duty under Kyle's to search for exculpatory evidence and found none, otherwise it would have been in his file. So that is where we have the suppression portion of the claim. The second answer to your question, Your Honor. Normally a Brady violation is not giving defense counsel what you already have. You say there's a duty of the prosecutor to go out and get things he does not have. That is a Brady violation. Yes, sir. And that specifically comes from Kyle's v. Whitley where the court states that in Kyle's v. Whitley. All right. So that's the violation here of not going out and getting something he didn't have. Yes, sir. And we argue that in this circumstance where Chris Dutton was a witness who the prosecutor had credibility issues, and we can see that from letters that are in the record where Mr. Dutton is touting his services. He's sending a letter back saying you have a question about my credibility. Check out North Carolina. Check me out. Look at me. Does the prosecutor have notice that there were mental illness records of Sutton around somewhere? I mean, something to alert him, the prosecutor, that he ought to go look for him? What we argue, Your Honor, is that the prosecutor in this case where TDOC was holding our client and where the evidence came from TDOC and TDOC stood in the shoes of the Madison County Sheriff's Department. That's a different argument that he has a duty to go out and find evidence that he doesn't have. The argument you just made now is he is responsible for anybody that works for the state and that it should be treated as if he has it because somebody else from the state has it. The imputed knowledge, yes, sir. I believe they go hand in hand. What's your best authority that that is a duty or that is his responsibility, that he is responsible for anybody else in the state that has records? I would cite two different lines of authority for you, Your Honor. First is, of course, Carragher v. Stewart and Gonzalez. Those are the most closely on point because Carragher deals with a state prosecutor and state prisons. A lot of the other cases that have been cited deal with different sovereigns. So you have situations where the state has a duty to go out and find evidence that he doesn't have. The state doesn't have to get federal evidence and the federal don't have to get state or we don't have to get something in an unrelated matter. Here, it's a state prosecutor, state records, where the state is standing in the shoes of the Madison County Sheriff's Department. They are, for purposes in our case, the Madison County Sheriff's Department. And I don't think that there's any argument to be made that a diligent prosecutor wouldn't be looking for those records, particularly where you have an informed state prosecutor. My second line of authority would be those cases where the courts have held that a United States attorney has an obligation to obtain BOP records. Because I think that's a very similar analogy because it's the same sovereign. But there's an even higher duty than that, I would argue, Your Honor, because in Kiles v. Whitley, the court talks about how if the prosecutor has a duty to go out and find evidence that he doesn't have. If the prosecution is on notice about a witness's credibility being an issue, they have an affirmative obligation. They were the only ones who could get these records. And it just makes sense. If you're calling an informant, which are inherently reliable, somebody who's in the prison, who's looking for a deal, first thing you're going to do is ask for his prison records to make sure he was even at Riverbend at the time that he says he was. And as soon as you request those prison records, you're going to get the mental health records. I mean, it just seems a little bit removed from the typical Brady claim. The typical Brady claim is the prosecutor has this exculpatory evidence in his file or in his possession or where he is, and he does not give it to the defense counsel. Rather than what you're arguing is that a good prosecutor would go out and find other things that could be there and then turn them over. Well, that doesn't seem like a normal Brady violation. He could have discovered things that were there that he did not, and therefore it's a Brady violation. That's not usually what I consider Brady. It's not maybe the run of the mine, but there are cases that deal with that, and I wouldn't say that it's just a good prosecutor. I would say that Kyles v. Whitley placed that burden on prosecutors. I'll take a look at the case. Thank you, sir. Let me ask you something else. One issue or potential issue in the case has to do with the failure of your client's state habeas counsel to present evidence that the case is a Brady violation. You didn't present evidence or argumentation regarding the competency of your client to stand trial at the time of the state collateral proceeding. I'm wondering if there's an issue under my tenuous as to whether there was an effective assistance of counsel and if so, if so, how did that happen? And if so, whether there's enough evidence of that claim that our court should consider sending the case back to the district court for an evidential hearing on that issue. Do you have anything to say about that? Yes, sir. I have plenty to say about that. As we raised in the petition initially, on initial submission, there was an issue raised that trial counsel should have the ability to have, was on alert, and should have moved for a competency hearing given his client's increasingly erratic and irrational behavior. There was a competency hearing, was there not? No, sir. There was not a competency hearing. There was not a hearing. There was an evaluation. Early on? The court appointed for an evaluation. So what are you saying, it was stale or wasn't, I mean, there was an evaluation. I mean, it's not the case that defense counsel was required to request one because there was already one had. Your Honor, yes, in answer to your question, it was stale. It was a drive-by evaluation, an MTMHI. Clearly not a thorough evaluation and certainly not one that had the benefit of observing Mr. Hall and his behavior as it continued. If Mr. Hall were here, he would say that those flags mean that this is not a legitimate court proceeding. Does that make him incompetent to stand trial? When he's incapable of rationally assisting his lawyer, yes, ma'am, it does. Because what we know from the proof in the record is that this wasn't just a personality disorder. This wasn't just a client who was being difficult or playing games. We know from hard proof that his brain is structurally damaged, which comes out functionally damaged. So even though he can copy jailhouse briefs and he can tape and some of the motions you see are after you can actually see where it was taped together. He can do all those things, but his brain doesn't communicate from one side to the next. He doesn't have frontal lobe abilities. We know this from science. We don't need anybody else. And that science did not happen. They didn't have anyone at trial looking at his brain and the way it worked. But we did have a lawyer telling the judge he needed a continuance in August of 1996 because he was having trouble communicating with his client. Mr. Hall's behavior should have alerted a competent attorney that this was a client who would become emotionally flooded. When you give him information, when you challenge a delusion, he becomes so emotionally flooded that he cannot engage in a rational conversation. When you challenge his fixed delusions, he cannot act in his best interest. He certainly was not able to sit through his court proceeding. Part of the reasons why we have a protection against trying people who are not incompetent is because they don't present very well in front of a jury. Mr. Hall was unable to sit through the trial because his brain doesn't allow him to suppress his emotions. And so he would speak out during the trial. You can look at the transcript. The second day of trial, he's moving to have his lawyer removed because he says his lawyer made certain arguments in the opening statement. And then when you look at the opening statement, which is a page and a half, those arguments are not there. He was delusional and he was not able to have a rational conversation with his lawyer. Not able to decide, for example, that he probably should have taken the plea agreement that was offered to him, where the victim's family didn't even want the death penalty. But he couldn't reason. And that's important. Rational assistance is what's the key here. We're not saying he's mentally retarded, but we are saying his brain doesn't work. Lots of portions of his brain doesn't work. He's got problems in the frontal lobe, problems with the amygdala. The amygdala is where we have anger, and he's not able to modulate that. And when we have the problem in the corpus callosum, that means the two sides of the brain aren't communicating. We know all of this from proof that is not controverted. But we didn't have that proof in state court. And the state post-conviction attorney failed to raise this claim. And because they failed to raise this claim, it wasn't adjudicated, but they should have. They should have been on notice just as trial counsel was on notice of the problems with Mr. Hall's brain functioning. And yes, Your Honor, we believe that it is important to remand. There's one factual error in the district court's opinion with respect to our competency evidence, if I may say so. If I may point that out. The court says that there's no evidence that Dr. Bremner considered Dr. Abel's report. That's factually inaccurate. Dr. Bremner looked at Dr. Gurr's evidence. Dr. Bremner is not competent to evaluate neuropsychological testing, but Dr. Gurr is. Dr. Gurr's report specifically addresses Dr. Abel's raw data and analyzes it. Dr. Gurr's report is the report that tells us that Mr. Hall's brain structurally is damaged, functionally is damaged, and that the neuropsychological testing bears that out. And when you compare the behaviors that you would expect to see from someone with the type of damage that Mr. Hall has, with the way Mr. Hall actually behaves, we see that, in fact, he was not competent. But that proof was not presented in state court, and it should have been. And we believe that we would prevail if given an evidentiary hearing on the matter. Let me ask you this. What information was available to Mr. Hall's state collateral proceedings counsel, bearing on the issue of his client's competency, which should have alerted counsel that he needed to raise that issue at the time? There would be things like my client's perseveration on the flag issue, his bizarre filings, asking the court to sign a contract under the UCC with respect to the flag, you would see his perseveration on issues respecting the venue claim, his dealings with Mr. Hall. We have in the record evidence from several lawyers who talk about the fact that Mr. Hall is unable to communicate with them. Every lawyer to a person says that Mr. Hall becomes emotionally flooded and unable to communicate with them, so he's not able to understand his legal situation or make decisions in his best interest with his lawyers. So his lawyers were left with a client who couldn't understand what they were doing and couldn't help him. The other evidence that they had, Your Honor, I think goes hand in glove with the proof regarding childhood trauma that Dr. Bremner's original report dealt with. Dr. Bremner, originally, if you look at his report, the 2008 report is criticized for not addressing competency, but that wasn't the referral question in the 2008 report. He updated that report in 2013, but he incorporated all of his findings from 2008. Post-conviction counsel was aware of the severe childhood trauma that Mr. Hall experienced, that he witnessed his father beat his mother so badly that blood was pouring out of her ears and her nose. They were aware of all of that, and it was competent counsel. So if we're using the Strickland standard, in 2004, 2005, when post-conviction counsel had this case, it was the professional norm to know about how childhood trauma affects brain development. But also, the Terry Mahoney affidavit, Your Honor, I think has been somewhat taken out of context. It's been, and that may be the brief's fault as well, it's been argued that Terry Mahoney's affidavit somehow is diagnostic. Obviously it's not diagnostic. She's not a doctor. She can't diagnose. Her affidavit establishes what the prevailing professional norms are for attorneys in these sorts of cases, and she lays out in better detail than maybe I am here all of the reasons why the lawyers were on notice that they had a client who was not competent. I would also direct Your Honor to the 2013 report of Dr. Bremner, where he goes through in great detail the record and all of Mr. Hall's behaviors that make it clear that he was not able to think rationally, and all of that information was known to state post-conviction counsel or could have been known to state post-conviction counsel. If I could return very briefly, because I have just one minute left, and there's one thing I forgot to say that I think is really important with respect to the Brady claim, with your indulgence, and that is when we look at Brady claims, particularly where Dutton's testimony goes straight to intent, it's Brady both as to the guilt and innocence phase, but also to the sentencing phase. There's a single aggravating circumstance in this case, and the state of Tennessee requires intent. There's a mens rea element to that aggravating circumstance, and again, the only evidence of Mr. Hall's mental state came from Dutton. That's the evidence that supports intent for the single aggravator in this case, and so if his credibility was called into question, we can conclude that there's a reasonable probability that at least one juror would not have found that aggravator, and if they had not, the sentence under Tennessee law would have been life. You don't think circumstantial evidence can go to the issue of intent? I think it can go to it, Your Honor, but when we're looking at Brady, we're looking at whether or not the withheld evidence undermines confidence. Your statement was that the only evidence to go to intent was from Dutton. Well, I don't think that's true, because I think the circumstantial evidence also went to his intent. I mean, am I wrong or not? May I continue my time as well? Your Honor, I believe that what the proof was was that there was a fight, and under Tennessee law, that would have been provocation and passion, and so the testimony, and again, this gets into one of the issues in our brief. The premeditation intent is driving there, disconnecting the phone, and I think the only reasonable inference is he is the one that disconnected the phone, leaving the scene, avoiding capture, and a few more other things in there that I don't think there's disputed that he did. I mean, if you look at the circumstantial evidence, it certainly looks like there's premeditation, deliberation, irrespective of Dutton's testimony. That's not the way the case was argued, and that's not the way the case is cited through all the reports, and the important fact is that Dutton said his intent was to make her suffer, and that is the only person who says that, and that is incredibly important. He could be convicted of first-degree murder, whether he intended her to suffer, I mean, as long as he planned it and deliberated, right? I mean, is intending to have her suffer an essential element in Tennessee law? No, sir, but that was the evidence that was presented and argued over and over and over again as evidence of premeditation, not only by the prosecution, but by every court who's looked at it. Okay, and I mean, how many wounds did she have? Didn't she have just multiple, multiple wounds? Yes, sir. Doesn't that show planning, deliberation, intention? I mean, it's not just one wound, but she's beaten repeatedly over and over and over again. I agree with you, it was a horrible crime. No, but that's circumstantial evidence, is it not? It's equally evidence, Your Honor, of rage and passion, which would negate premeditation. What about the girl's testimony? Two of them testified to this, that he told them that if they went for help, he would kill their mother. Yes, ma'am. That's damaging evidence. It is not evidence of intent, Your Honor. No, I don't believe it is. I also would encourage the court to use the standard under Kyle's and look at all the suppressed evidence, which shows that the girls gave a different story to the TBI before their trial. These were juvenile witnesses. The state needed Dutton. And again, it's not a sufficiency of the evidence test, it's whether or not there's confidence undermined. And again, you need the intent to make her suffer to get the aggravator. They do need that to get the aggravating circumstance. I appreciate Your Honor's letting me take the extra time, and we ask the court to remand the case for an evidentiary hearing. Thank you. May it please the court, John Bledsoe on behalf of the respondent. If I may, I will address the competency issue first, and then turn to the Brady issue. The record shows that after the petitioner's arrest, and at some point after he was placed into safekeeping with the Department of Correction at River Bend Maximum Security Institute, he was submitted to a competency evaluation by the Mental Tennessee Mental Health Institute, MTMHI, the Forensic Services Division. According to the letter returned from that director in March of 95, I believe, they did outpatient review with him. He was then inpatient with the Forensic Services Division for some time. They found that he was competent to stand trial. The case proceeded to trial. Wasn't it the case, and correct me if I'm wrong, that the report that you referred to was not signed by or attested to by a physician or psychologist? It was sort of a report of the organization, so to speak? It was a letter signed by the director. I'm not sure if the record that we have fleshes out further the process behind the letter, in terms of deficient performance. But he was not a physician or anything like that? Honestly, Your Honor, I don't know, and I'm not sure if the record clarifies. It might, but I don't recall. He speaks in terms of we. We evaluated him. We did this. The argument today is, okay, they had an evaluation, a competency evaluation, but afterwards there's enough other things that came along that should have alerted defense counsel that maybe we ought to do it again. While the case was pending. Before trial. We ultimately have the testimony from the two psychologists who testified at trial, neither of whom indicated a problem with competency. And I would say, and some more that later happens, the petitioner's conduct that counsel speaks to is the conduct he continued in throughout the course of the case. He was difficult for his attorneys to deal with. I think that's a fair statement. He filed lengthy pro se pleadings, but they were cogent. They were making arguments. They were baseless arguments in a lot of ways, but it didn't go to an issue of competency. So what the district court ultimately concluded is that in that situation, it was reasonable for trial counsel, in this gap time leading up to trial, to rely on their own experts. This is a request to get a second evaluation. They have one already, and there's no indication under the record, certainly, that they questioned that finding of competency. In fact, specifically, Dr. Zager provided her own testimony about depression, alcohol dependency, in terms of explaining the conduct at the time. There's nothing in there that would lead one to suspect there was even a question raised by those experts at the time of competency, which goes to determining whether there was deficient performance. Mr. Hall's counsel said that all they really had was a drive-by evaluation. It was an inpatient evaluation in the department. The type of evaluation that is done in these types of cases. It was done at MTMHI, ordered by the trial court. It was not done by an expert retained by one side or the other. Yes, Your Honor. To what extent may counsel be deemed to have been unreasonable and deficient by not relying on what the law provided and their own experts that they have retained and are working with. Even if there were a question of deficient performance, there's no basis to find, to suspect that you have a substantial claim of prejudice in light of everything that has followed. You had post-conviction proceedings where there was specifically hotly contested among the experts regarding whether the petitioner had intermittent exposure, I'm sorry, intermittent explosive disorder. But in those proceedings, the psychiatrist, Dr. Caruso, that post-conviction counsel retained, specifically testified he's competent. The state's expert in her report states he is competent. So by the time you get to post-conviction, you also have additional testimony that he was competent. Now I would say that would undermine any claim that post-conviction counsel under Martinez provided deficient performance for the same reason trial counsel didn't find deficient performance. You get to post-conviction, they're actually disputing mental health issues. There's a dispute among the experts, but not as to competency. And to what extent could post-conviction counsel rely on that? I do, I agree, I think the issue here is is there a substantial claim? And also, which the district court rejected, is there some indication that additional development is required? And I would submit that it's not. You also had the district court challenging the information that was before Dr. Brynmer. Counsel spoke to some of that. But you also had the issue of Dr. Brynmer apparently didn't even meet with the petitioner. Whereas, specifically as to the post-conviction experts, Dr. Caruso and the state's expert, Dr. Stalford, as well as Dr. Albo, the psychologist, they all met with him for hours. And so weighing all of that together, you don't have a substantial claim of either deficient performance or prejudice. Certainly, it does not appear there's any way with further proceedings the petitioner could show ineffective assistance of post-conviction counsel. So under the Martinez procedures, there's no basis to do anything but affirm the district court's conclusion as to that claim. Regarding grading, I think it's helpful to point out how this was litigated in the federal habeas proceedings. After the discovery process, the petitioner filed an amended petition, or amendment to the petition. I believe this is record entry 54, explaining as a component of their Brady claim information regarding Chris Dutton. And this was information from TDOC records. They didn't address the issue of imputed knowledge, whether TDOC was within the prosecution team. The state addressed that in their answer. Later, the state filed a motion for judgment on the pleadings, and in response to that, the petitioner did address that. And that's record entry 100. And their argument before the district court in terms of imputed knowledge essentially boils down to the prosecutor knew Dutton was in prison. The prosecutor knew that the prison has records. The prosecutor could get those records. And the prosecutor had a duty to get those records. That was the argument in the district court. And that is not correct. About a week before the district court rejected the claim. Well, I will say what the district court concluded was that the petitioner had identified no authority from this court that placed a duty under Brady to go out and get material that it does not already have. There's certainly an obligation on the point of the specific prosecutor to kind of discover what is within the knowledge of the prosecution team. But knowledge with another government entity outside the prosecution team, there's no duty to discover that. There's a duty to disclose what you have, but not a duty to discover. You say that. Do you have any authority? Yes, Your Honor. I point to the Goff case, which is cited in I think both briefs. 2010 published opinion from this court. It actually was issued eight days before the district court's decision, but it's not cited. But the district court's decision is fully consistent with it. Goff was addressing whether there was a duty to disclose information about federal prosecution of a witness in a state matter. I believe I had that correct. And this court looked to specifically cases from other circuits. It looked to one, the Moon case from the 11th Circuit, in terms of how do you determine who has that obligation. And it comes down to those arms of the government, those agents of the government who are involved in the investigation and prosecution of the case. The Moon case, the 11th Circuit case that the court cited to, it kind of listed three factors which this court looked to as well. Whether there were shared resources or labor, whether the two were working together during the investigation of the defendant, whether one was working under the direction or supervision of the other. None of those characteristics apply here. The Tennessee Department of Sheriff's Departments of the District Attorney General. And there's no indication in this record that they played any role in the investigation. That's the key and issue under Goff. Now this court looked to Goff and applied Goff in Sutton, which was another Tennessee capital case. Sutton, I submit, is more like what we have here because it's all state of Tennessee entities. In Sutton, a forensic pathologist was a rebuttal witness for the state. He was under investigation by agents with the Tennessee Department, Tennessee Bureau of Investigation. TBI agents were also involved in the investigation of Mr. Sutton's case. And the argument made was because you had TBI agents over here investigating Dr. Harlan, TBI agents over here investigating Mr. Sutton, that made all of them part of the prosecution team and this court said no. Because there was no evidence or indication that those units were working in concert or in some way connected. Here it's even more removed than that. You're not talking about units within one agency and one single director. It's a completely different agency. Looking to the facts that we have, there is no basis to find that TDOC was part of this prosecution team and that the knowledge within TDOC is imputed onto it. And from our standpoint, that resolves the Brady claim. That answers the Brady claim. If there's not an obligation, a duty to discover that because they're outside the prosecution team, then there's no basis of finding a Brady claim. Okay, what if we did find a Brady claim and then we have to find out whether it had an impact on the verdict? Correct, correct. And that gets to materiality. A reasonable probability, sufficient to undermine confidence. Evidence to impeach a witness. Correct, correct. The argument I think you raised in your brief was there's plenty of other evidence that Dutton to support what Dutton said. Correct, correct. So it didn't make any difference. I don't dispute he was an important witness but there was other evidence to show all of these factors. And it would have been additional evidence. Well, a lot of it relates to his work as an informant in other cases. The jury was informed of that. There would have been more information of that, but that was provided. And as it has been touched on, the evidence, certainly the evidence of the killing is testimony. His statement said if they went for help, he was going to kill her. Statement, she would not live to graduate. He comes into the house, immediately knocks her over. He assaulted her 83 separate times. She got away, got out of the house. He caught up to her, drug her to the pool, strangled her and drowned her. What we're talking about is information in TDOC records that might impeach his credibility but it's not going to touch any of that evidence that's presented, particularly by the Daughters. Unless the Court has further questions, we ask the Court to affirm the judgment of the District Court. Thank you. Thank you, Your Honors. With respect to the competency claim and counsel's duty to investigate, the Supreme Court case law is clear that counsel's decisions about what they do or don't do is only as good as their investigation. And the evidence is clear here that they did not do the investigation. When we look at the two expert witnesses, actually there was only one expert witness called at trial. The other gentleman was a treating psychologist from TDOC who said that Mr. Hall was incredibly remorseful and that he prescribed him psychiatric medications. But he was not a forensic expert. Dr. Zager is not a neuropsychologist. She's a clinical psychologist. She did not give any neuropsychological testing. There was no brain imaging done at trial, even though it was clearly called for. And even though state post-conviction counsel knew and was pursuing evidence of the behavior that he was seeing, they were wanting to call it intermittent explosive disorder. But in fact, we know that the evidence that we're seeing from Mr. Hall's broken brain is in fact exactly what was causing those behaviors that they wanted to call intermittent explosive disorder, but caused him to have an inability to rationally assist. And your Honor, when we talk about the MTMHI, and I will call it a drive-by evaluation because that is standard practice and anybody who practices in Tennessee knows it. It wasn't signed by a psychologist. And it doesn't say that he could rationally assist counsel. The word rational is not in the letter. They don't use the language of Dusky in their opinion. But Mr. Hall... They say he's competent to stand trial, do they? Isn't that the legal, what we look for, is competency? You're talking about how you might define competency to stand trial, but that's the ultimate determination we make, right? They use a specific language, Your Honor, which is that he understands the charges against him and he's able to assist counsel, but they don't use the word rational. That does not appear anywhere in their decision, and that's critical. That's what we're relying on here. So that should have alerted defense counsel that the evaluation was inadequate? Yes, sir. Reasonable. What the standard is, the standard of professional care for individuals who are doing capital work, is that they should have seen that behavior and they should have looked further. In capital cases, you're required to have a multidisciplinary team of mental health experts, because each of them has their lane. And none of the experts that were used in state court were in the lane that they needed to be in order to understand Mr. Hall's extreme dysfunctioning. This is a man who lives every day in a world where he cannot rationally understand what is happening to him and why his lawyers are not able to get him out today because there's not venue or because the flag isn't the right flag. He literally doesn't get it and he is tortured and he is remorseful. So I would say that would prove that we're at least entitled to a hearing, a remand and a hearing on these issues. With respect to this court's unpublished opinion in Sutton, I would argue that that is completely an opposite to the matter that we have here today. Dr. Harlan was being investigated on a completely separate issue. Here we have in TDOC, and I'm not saying that the court needs to have a broad opinion, like the decision in the Ninth Circuit, which is very broad. Narrowly, under the circumstances of this case, where TDOC did stand in the footsteps of the Madison County Sheriff's Department, there was an obligation for the prosecution to get those records, particularly where there were serious credibility problems with Dutton. And if you could have cross-examined him on the fact that he believed he was possessed by demons and the fact that he was convicted for providing false evidence to the police, that would have severely undermined his credibility and that undermines confidence in the outcome of this case, where the defense was lack of intent. And where, when you look at the prosecutor's closing argument, he always goes back to Dutton. He doesn't go to anybody else. And when you look at the decisions from the courts, they rely on Dutton. They don't always ascribe it to Dutton. But the testimony is from Dutton and Dutton alone. I urge you to read the trial transcript. It won't take you half a day because it's the shortest capital trial I've ever seen. And you will see that this is in fact a Brady claim that is material and that was suppressed and we should at least be able to have an evidentiary hearing on the Brady claim as well. I thank you for your time.